IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **PATRICIA TOLBERT**, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **4:10-CV-349-L** |
| | § | |
| **MICHAEL J. ASTRUE**, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the court is the social security appeal of Patricia Tolbert. Based on the relevant findings, evidence, record, and applicable law, the court, pursuant to sentence four of 42 U.S.C. § 405(g), **reverses** the final decision of the Commissioner of Social Security (the "Commissioner") and **remands** this action for further proceedings consistent with this memorandum opinion and order.

**I.     Background**

Patricia Tolbert ("Tolbert" or "Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security denying her claim for disability benefits under Titles II and XVI of the Social Security Act. On April 5, 2007, Tolbert applied for supplemental security income and disability insurance benefits, alleging disability since June 30, 1989, due to depression, "bipolar," hepatitis C, obsessive compulsive disorder, anxiety, "suicidal," hypertension, "self-mutilation," paranoia, and social disorder. A.R. 158. Her application was denied initially and upon reconsideration. *Id.* at 58-61. She timely requested a hearing before an administrative law judge ("ALJ") and appeared at the hearing, represented by an attorney, on December 2, 2008. *Id.* at 21-57.

**Memorandum Opinion and Order – Page 1**

At the hearing, Tolbert amended her alleged onset date to March 27, 2007, which precluded any potential eligibility for her disability insurance benefits claim and resulted in dismissal of her Title II claim. *Id.* at 10, 41-42. On April 27, 2009, the ALJ issued a decision finding Tolbert not disabled, which precluded her from recovering supplemental security income. *Id.* at 10-20. On March 26, 2010, the Appeals Council denied Tolbert's request for review of the ALJ's decision, and the ALJ's April 27, 2009 ruling became the Commissioner's final administrative decision for the purposes of judicial review. *Id.* at 1-5, 20. This action was transferred from Forth Worth to this court on March 23, 2011. Tolbert specifically requests a reversal of the Commissioner's decision and a "sentence four" remand under 42 U.S.C. § 405(g) to evaluate her impairments and limitations with proper rulings and regulations.

### A.     Medical Evidence

Tolbert's relevant medical history began in late 2001, when she was diagnosed with multiple mental impairments including bipolar disorder with mixed emotional features, obsessive compulsive disorder, and cocaine dependence. On October 24, 2001, at Tarrant County Mental Health/Mental Retardation Services ("MHMR"), she underwent a Uniform Assessment and treatment plan process, a Multnomah Community Ability Scale, a Brief Psychiatric Rating Scale, and a psychiatric evaluation. *Id.* at 364-66, 372-82, 531. The evaluations revealed significant mental health issues stemming in part from Tolbert's emotional, physical, and sexual abuse as a child. *Id.* at 385. They showed that, among other things, she suffered from moderate paranoia, chronic depression, poor concentration, emotional withdrawal, and being uncomfortable in public. *Id.* at 376-82, 533-34. Her evaluating physician, Dr. Mims, finally determined that Tolbert could not work due to a permanent

mental disabling factor that has been present since her childhood. *Id.* at 334. She was prescribed Prozac. *Id.* at 536.

Over the course of the next few months, Tolbert attended treatment through the Real AIDS Prevention Project and other specialized services. *Id.* at 340-63. She demonstrated compliance and improvement over the course of her participation in the group sessions. *Id.* at 359. Her Prozac dosage was increased on November 19, 2001. *Id.* at 339. By February 7, 2002, MHMR reported that Tolbert was refusing to participate and that she had not made progress. *Id.* at 331. MHMR conducted another Mental Health Annual Uniform Assessment on February 25, 2002, and another psychiatric evaluation on March 4, 2002. Tolbert was found cooperative, calm, anxious, and alert, with no signs of hallucinations, delusions, or suicidality. *Id.* at 395. Tolbert's primary problem was noted as anxiety, which acted as a root cause of her secondary depression. *Id.* at 396.

On July 6, 2003, Tolbert's mother found her disoriented at home and took her to the emergency room. *Id.* at 260. She was diagnosed with uncontrolled hypertension and cocaine abuse. *Id.* Tolbert returned to the emergency room on June 26, 2004, for hypertension and received another prescription. *Id.* at 235-36. She also received a CT scan, chest x-ray, and additional medication for nausea and pain. *Id.* at 238, 250, 253. Tolbert arrived once again at the emergency room on March 21, 2007, and received another negative CT scan. *Id.* at 210, 214, 224. Her chest view showed mild cardiac enlargement and some prominence of the right hilar structures. *Id.* at 225.

Tolbert was psychologically evaluated again on June 5, 2007, by Donald Baer, M.A. *Id.* at 291. In Mr. Baer's evaluation, which was approved by Dr. Cannici, he described Tolbert's mood as "on edge," but he found her oriented and cooperative. *Id.* at 292. He also concluded that Tolbert had obsessive compulsive disorder, due to her hoarding, and Borderline Personality Disorder, due

to her impulsivity, repeated suicide attempts, self-mutilation, and paranoia. *Id.* at 293. Another psychiatric review was performed a few weeks later by Dr. Reddy. *Id.* at 299-311. Tolbert was found somewhat limited by anxiety and paranoia, but her ability to function was not wholly compromised. *Id.* at 310-11.

On June 7, 2007, Tolbert was examined by a Quality Care Medical Group physician. *Id.* at 295. The diagnosis revealed that she continued suffering from muscle aches in her legs and hypertension; additionally, Tolbert still had hepatitis C, which she was first diagnosed with in 2001. *Id.* at 296. On June 29, 2007, a residual functional capacity ("RFC") assessment was conducted. *Id.* at 313. Tolbert reportedly had exertional limitations and was occasionally able to lift 50 pounds, frequently able to lift 25 pounds, could stand or walk for six hours in a workday, could sit for about six hours in a workday, and had unlimited abilities in pushing and pulling. *Id.* at 314. Although Tolbert's mental health was noted as her primary problem, she still suffered from high blood pressure and hepatitis C.

MHMR conducted another psychiatric evaluation on November 27, 2007. *Id.* at 451-58. She exhibited extreme paranoia and was diagnosed with Major Depressive Disorder with psychotic features, personality disorder, and cocaine dependence. *Id.* at 454. She was prescribed Geodon. *Id.* at 452-53. On January 24, 2008, Tolbert was given a fact sheet on bipolar disorder, and she explained that she wanted help for her mental problems but could not handle being around people. *Id.* at 459, 464. An inventory of depressive symptomatology showed that she had extreme difficulty falling and staying asleep, medium difficulty concentrating, recurring thoughts of death, and restless feelings. *Id.* at 468. She received another prescription for Geodon. *Id.* at 510.

Another MHMR assessment was performed on May 7, 2008, by Dr. Habbu. *Id.* at 502. Tolbert demonstrated a reduced social drive in addition to emotional and conceptual disorganization. *Id.* at 503. On July 2, 2008, MHMR conducted a Schizophrenia Algorithm assessment on Tolbert. *Id.* at 482. She was found to be experiencing audio hallucinations and was somewhat delusional. *Id.* at 484. Her Geodon dosage was increased. *Id.* On August 6, 2008, Dr. Habbu assessed Tolbert again and determined that she was unable to meet competitive standards and that she demonstrated difficulty remembering work-like procedures, understanding and carrying out simple instructions, maintaining attention or regular attendance, sustaining an ordinary routine or responding to changes, working with others, completing normal workday without interruptions, dealing with normal work stress, and being aware of normal hazards. *Id.* at 470, 519.

    **B.**    **Hearing Testimony**

At the hearing before the ALJ on December 3, 2008, Tolbert testified about her condition. *Id.* at 24. Regarding her mental symptoms, she stated that she had racing thoughts "all the time" and that she always had to make sure she was "safe and secure" by keeping watch over "windows and doors, make sure they're locked." *Id.* at 28-29. She further testified that she suffered from depression, bipolar, hypertension, schizophrenia, and suicidal thoughts. *Id.* at 31. Specifically, she explained, "I hear things. I see them, too. I can feel them around me. I feel a danger around me." *Id.*

Tolbert's friend, Ms. Kraff, also testified at the hearing about Tolbert's condition. *Id.* at 38. Ms. Kraff testified that she would see Tolbert every day for about four to six hours and that Tolbert does not like people. *Id.* at 38-40. Additionally, Ms. Kraff asserted that she had never seen any drug

paraphernalia in Tolbert's possession and that Tolbert's altered mental status was never a result of drug use. *Id.* at 40.

In addition, medical expert Dr. John Simonds testified and concluded that Tolbert was capable of performing medium work. *Id.* at 45. He did note, however, that she would "have trouble with details and exposure to public and co-workers," which acted as limitations. *Id.*

Vocational expert Barbara Dunlap also testified at the hearing. *Id.* at 52. She opined that there were tens of thousands of jobs in the national economy that Tolbert would be capable of filling, despite her limitations. *Id.* at 52-53. Specifically, Dunlap testified that Tolbert could find unskilled work as a light or medium level cleaner, which accounts for in excess of 80,000 jobs, or a medium level laundry worker, which accounts for in excess of 50,000 jobs. *Id.* at 52-53.

### C.    ALJ's Findings

The ALJ denied Tolbert's application for benefits by written opinion issued April 27, 2009. *Id.* at 10-20. He determined that Tolbert had not engaged in substantial gainful activity since the alleged onset date of June 30, 1989. *Id.* at 12. He also determined that Tolbert suffered from the severe impairments of obsessive compulsive disorder, bipolar disorder, hypertension, and cocaine addiction, but he concluded that such impairments did not meet or medically equal a listed impairment. *Id.* at 12-13. He further determined that Tolbert had the RFC to perform medium work as defined under 20 C.F.R. § 416.967(c), with some additional limitations including not being able to: climb scaffolds, ladders, or ropes; understand, remember, and carry out more than simple instructions; have more than superficial interaction with coworkers; interact with the public; and adapt to more than simple changes in a routine work setting more often than on a weekly basis. *Id.* at 13.

In making these findings, the ALJ rejected some of the testimony of Tolbert and Ms. Kraff as lacking in credibility. *Id.* at 14. Specifically, the ALJ concluded that Tolbert's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, but the intensity, persistence, and limiting effects of her symptoms were not entirely credible. *Id.* Similarly, the ALJ determined that Ms. Kraff, Tolbert's friend, accepted Tolbert's subjective complaints uncritically and was provided unpersuasive, though well-intentioned, testimony. *Id.* The ALJ relied heavily on the testimony of Dr. John Simonds, the impartial medical expert, and found Dr. Simonds's testimony to be well-reasoned, persuasive, and well-supported by the evidence from treating sources. *Id.* at 15. Dr. Simonds concluded that Tolbert suffered from no physical or mental impairment that rendered her presumptively disabled, and he testified that she had the RFC for medium work, excluding detailed tasks or exposure to the public or coworkers because of her mental impairments. *Id.* Other than hypertension, the ALJ noted that Tolbert suffered from no physical limitations. *Id.*

The ALJ gave limited weight to the August 6, 2008 statement made by Dr. Habbu, which conveyed that Tolbert was unable to meet competitive standards in many work-related activities. *Id.* at 18. The ALJ concluded that Dr. Habbu offered his opinion as a well-intentioned advocate for his patient, but the statement did not consider the vocational aspects required in evaluation of a disability under the Social Security Act and Regulations. *Id.* Additionally, the ALJ found Tolbert's overall credibility suspect because she has virtually never been compliant with any type of medication or treatment protocol and went without mental health treatment for years until she resumed it before seeking Social Security benefits. *Id.* at 19-20. The ALJ also speculated, without any supporting basis, that it was Tolbert's criminal record, not any disability, that had compromised

**Memorandum Opinion and Order – Page 7**

her ability to seek and obtain work. *Id.* at 20.  He concluded that there was a significant number of jobs in the national economy that Tolbert could perform, including work as a cleaner or laundry worker. *Id.* at 19-20.  Ultimately he determined that Tolbert had not been disabled since the March 27, 2007 date of her application.  *Id.* at 20.

## II.   Legal Standard

In effecting judicial review of the Commissioner's denial of benefits, the district court must determine whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3).  Substantial evidence is "more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (citations and internal quotation marks omitted).  It is evidence relevant and sufficient enough to permit a reasonable mind to accept it as adequate support of a conclusion.  *Id.*  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment – rather, it scrutinizes the record to determine whether substantial evidence was present.  *Greenspan*, 38 F.3d at 236.  A determination that substantial evidence is lacking is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

## III.   Analysis

Tolbert contends generally that the findings of the ALJ were not supported by substantial evidence. Specifically, Tolbert raises three issues on appeal: (1) whether the ALJ properly analyzed or afforded sufficient weight to the written statement of Tolbert's treating physician Ranganath

Habbu, M.D.; (2) whether the ALJ adequately considered testimony from Tolbert's friend Ms. Kraff; and (3) whether substantial evidence supported the ALJ's implicit finding that Tolbert is capable of sustaining work.

The court first addresses the amount of weight the ALJ afforded to Dr. Habbu's medical opinion. Dr. Habbu was Tolbert's treating physician in 2008. Plaintiff contends that the ALJ did not demonstrate the good cause necessary to assign limited or no weight to Dr. Habbu's medical opinion. It is a settled point of law that an ALJ may only diminish the weight assigned to a treating physician's opinion when "good cause" is shown. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). To this end, Tolbert argues that the ALJ did not perform the six-factor analysis set forth and required by 20 C.F.R. § 404.1527(d)(2) to reject a treating physician's opinion.

In response, the Commissioner asserts that the six-factor analysis under 20 C.F.R. § 404.1527(d)(2) is not controlling because such analysis applies only to claims for disability benefits under Title II of the Social Security Act. Because Tolbert stipulated to amend her onset date to March 27, 2007, and preclude herself from recovering disability insurance benefits under Title II, the six-factor analysis under 20 C.F.R. § 404.1527(d)(2) does not apply. Instead, the Commissioner asserts that the multiple factor analysis under 20 C.F.R. § 416.927(d) controls, because it applies to claims for supplemental security income under Title XVI of the Social Security Act. Tolbert, in reply, makes no challenge to the Commissioner's assertion, but she nevertheless contends that the ALJ failed to adequately demonstrate good cause for rejecting Dr. Habbu's medical opinion under the § 416.927(d) factors. The court accepts that the § 416.927(d) factors should have guided the ALJ's analysis in determining whether to reject the opinion of the treating medical physician in connection with a claim for supplemental security income under Title XVI.

With respect to the § 416.927(d) factors, the regulations provide as follows.

> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. *We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion.*

20 C.F.R. § 416.927(d)(2) (emphasis added). These factors include: (1) the length of treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion through medical evidence; (4) the consistency of the opinion compared to the record as a whole; (5) the physician's specialization and area of expertise; and (6) any other factors which tend to support or contradict the medical opinion. *Id.* § 416.927(d)(2)-(6). The Commissioner contends that the ALJ "explicitly" described these factors in his written decision. The court disagrees.

In the ALJ's written decision, he addresses Dr. Habbu's medical opinion briefly in a single paragraph. *See* A.R. 18. The ALJ states that he reviewed Dr. Habbu's opinion and determined that, in certain categories concerning Tolbert's "mental abilities and aptitudes needed to do particular types of jobs," Tolbert had a "limited but satisfactory" ability. *Id.* The ALJ went on to state that those categories overlapped with some others previously mentioned by Dr. Habbu in which he determined that Tolbert was unable to meet competitive standards. *Id.* The ALJ apparently perceived this "overlap" as an internal inconsistency in Dr. Habbu's medical opinion, which caused him immediately to conclude that "Dr. Habbu is no doubt offering opinion as a well-intentioned advocate for his patient," and he gave Dr. Habbu's opinion "limited weight." *Id.* Although the Commissioner, in his briefing, attempts to analyze the other relevant § 416.927(d) factors in support

of the ALJ's decision to reject Dr. Habbu's testimony, including consistency, supportability, and specialization, the court is not satisfied that the ALJ took it upon himself to properly apply those factors in his written decision.

The regulations explicitly provide that "[w]e will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." 20 C.F.R. § 416.927(d)(2). The court believes that the ALJ's immediate determination that Dr. Habbu was acting as a "well-intentioned advocate" for his patient was conclusory, dismissive, and unsupported by the ALJ's short analysis. It goes without saying then that such conclusory and dismissive statements, absent sufficiently in-depth analysis, do not constitute "good reasons" to reject the medical opinion of a treating physician.

In the few lines of text that the ALJ devoted to discussing Dr. Habbu's opinion, he did not even mention the § 416.927(d) factors, let alone discuss them in any sufficient level of detail. The ALJ did not find as a factual matter, and based on competing first-hand evidence, that another doctor's opinion was more well-founded than Dr. Habbu's opinion, or weigh Dr. Habbu's opinion on Tolbert's disability against the medical opinion of other physicians who had treated or examined Tolbert and had specific medical bases for a contrary opinion.[*] *Newton*, 209 F.3d at 458. The ALJ was therefore required to perform the analysis of the factors outlined under 20 C.F.R. § 416.927(d) before rejecting Dr. Habbu's opinion. The "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza v. Apfel*, 219 F.3d 378, 393

---

[*]Although the ALJ found the testimony of medical expert Dr. Simonds persuasive and dispositive, the administrative record makes clear that Dr. Simonds was never Tolbert's treating physician. The court has concerns as to how the ALJ, providing nothing more than a cursory analysis, could be so dismissive of the medical opinion of a physician who actually treated and interacted with Tolbert, while simultaneously demonstrating an unwavering acceptance of the opinion of another physician who did nothing more than review Tolbert's medical records.

**Memorandum Opinion and Order – Page 11**

(5th Cir. 2000) (citation omitted). The ALJ should have considered the evidence he relied on in light of the entire record, and he should have made that clear in his written decision. There is no indication from the ALJ's short narrative discussion that he did that with respect to Dr. Habbu's medical opinion.

The ALJ's failure to consider all of the evidence and to conduct an analysis under the § 416.927(d) factors was in error. Accordingly, this case must be remanded to the Commissioner for reconsideration of Dr. Habbu's opinion under the factors set forth in 20 C.F.R. § 416.927(d). Because remand is required on this issue, and its determination could impact the remaining issues for review – including the credibility afforded to Ms. Kraff's testimony and whether substantial evidence supports the ALJ's implicit finding that Tolbert is capable of sustaining work – the court does not consider them.

### IV. Conclusion

For the reasons stated herein, the court **grants** Plaintiff's request to remand this case to the Commissioner for reconsideration of Dr. Habbu's medical opinion under the factors set out in 20 C.F.R. § 416.927(d). Accordingly, pursuant to 42 U.S.C. § 405(g), the court **reverses** the Commissioner's final decision and **remands** this case under sentence four to the Commissioner for further proceedings consistent with this memorandum opinion and order.

**It is so ordered** this 24th day of August, 2011.

*/s/ Sam A. Lindsay*
Sam A. Lindsay
United States District Judge